**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

MAE-LYN DEBOARD,

    Plaintiff,

v.              CASE NO. 2:13-cv-12838

LIBERTY LIFE ASSURANCE COMPANY  HON. MARIANNE O. BATTANI
OF BOSTON,

    Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD, DENYING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD, AND AFFIRMING THE
<u>DECISION OF THE PLAN ADMINISTRATOR</u>**

    This matter is before the Court on the parties' cross-motions for judgment on the administrative record. Plaintiff Mae-Lyn DeBoard brings the instant action seeking judicial review of Defendant Liberty Life Assurance Company of Boston's denial of long-term benefits under an employer-sponsored group disability insurance policy. The matter is fully briefed; therefore, the Court finds that oral argument will not aid in the resolution of this matter. <u>See</u> E.D. Mich. L.R. 7.1(f)(2). For the reasons stated below, Defendant's motion is **GRANTED**, Plaintiff's motion is **DENIED**, and the decision of the plan administrator is **AFFIRMED**.

**I. STATEMENT OF FACTS**

  **A. Background**

    Plaintiff Mae-Lynn DeBoard began working for Comcast as an Event/Upgrade SFU – Direct Sales Representative on approximately August 10, 2009. (A.R. 1369). In accordance with her employment benefits, DeBoard received disability insurance

1

coverage through a group insurance policy ("the Plan") provided by Defendant Liberty Life Insurance Company of Boston ("Liberty").

In January 2010, Liberty received notice of a claim by DeBoard for Short Term Disability ("STD") benefits under the Plan after falling at home and breaking her right elbow. Dr. Michael Yusaf indicated that DeBoard could not use her right arm, and she should not work from January 24, 2010 to approximately March 15, 2010. (A.R. 1656). On February 19, 2010, Liberty sent a letter to DeBoard advising her that she had been approved for STD benefits under the Plan. The letter also advised that per the Comcast STD Plan, in order to receive ongoing benefits, DeBoard must provide proof of a disability within a required timeframe. Liberty sent requests to various doctors who treated DeBoard. (See A.R. 1602, 1617).

Over the early months of 2010, Liberty received various medical documents. For example, Liberty received Restriction Forms from Dr. Yusaf on April 5, 2010, and June 1, 2010. (See A.R. 1532, 1579). On June 16, 2010, Liberty sent DeBoard a letter advising that she has been receiving STD benefits since January 24, 2010, and the Plan provides benefits for a maximum period of 26 weeks. (A.R. 1471). Therefore, her benefits were expected to end on July 31, 2010. (Id.)

Prior to July 31, 2010, Liberty began investigating the potential for DeBoard to receive Long Term Disability ("LTD") under the Plan. In response to Liberty's requests, Dr. Greg Nowinski, who operated on DeBoard's elbow, responded to certain questions regarding DeBoard's condition. Dr. Nowinski determined DeBoard should avoid lifting objects weighing more than 10 pounds. (A.R. 1423).

In furtherance of its investigation, Liberty requested an occupational analysis from Cascade Management, a vocational rehabilitation consulting company. Cascade conducted and produced a report on August 11, 2010. (A.R. 1413). Cascade concluded that DeBoard "would not be precluded from this occupation as she would be able to complete this occupation as an inside sales representative," (A.R. 1416). The report further explained that based on DeBoard's education and experience, she would fall in the 25th to 50th percentile for wage data (approximately $3,017 to $4,121/month). However, as per the definition of Own Occupation, a person is unable to perform his or her own occupation if he is unable to earn 80% of his pre-disability earnings. Because the earnings associated with this field are less than the 80% threshold (approximately $2,424 to $3,707/month), DeBoard was approved for LTD benefits on August 19, 2010, and Liberty sent DeBoard a letter dated August 23 2010, advising her that she is eligible to receive benefits as of August 1, 2010. (A.R. 1371).

Under the Plan, "Disability" or "Disabled" with respect to Long Term Disability means:

> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>
>     a. if the Covered Person is eligible for the Maximum any Occupation benefit, "Disability" or "Disabled" means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of Any Occupation.
>
>     b. (i) if the Covered Person is eligible for the 12 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 12 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

3

>> (ii) thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

(A.R. 9).

> Further, "Own Occupation" under the Plan means:
>
> the Covered Person's occupation that he was performing when his Disability or Partial Disability began. If the Covered person is unable to earn 80% of his pre-disability earnings, he will be considered unable to perform his Own Occupation. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

(A.R. 12).

> Finally, "Any Occupation" under the Plan:
>
> With respect to Class 4, means any gainful occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity. Gainful occupation means an occupation in which the earnings are:
>
> - equal to or greater than 80% of the Employee's pre-disability income;
> - less than 80% of the Employee's average pre-disability income, but higher than the average earnings for the geographic area in which the Employee resides; or
> - equal to or greater than the gross benefit.

(A.R. 7).

In anticipation of the change in definition of DeBoard's disability from "Own Occupation" to "Any Occupation" to occur the following year on August 1, 2011, Liberty requested updated medical forms from DeBoard's various physicians. (A.R. 1035, 1040). After the updated medical records were received, Liberty referred DeBoard's case to one of its consulting physicians, Dr. Claudia Restrepo-Gartner, who prepared a clinical case review, summarizing her findings on July 29, 2011. (A.R. 825).

Based on Dr. Restrepo-Gartner's findings, on August 4, 2011, Liberty sent DeBoard a letter advising that they will be discontinuing her benefits. (A.R. 822). As per instructions in the letter, DeBoard sent a handwritten letter to Liberty stating her intent to appeal the decision on August 21, 2011. (A.R. 803). DeBoard included additional medical records from Dr. Stephen Boodin, which indicated that she was to undergo additional surgery for her back condition on September 14, 2011. (Id.) Liberty sent a letter to DeBoard on September 6, 2011, advising that her benefits will be reinstated and that her claim will be "evaluated periodically to determine ongoing disability." (A.R. 787). Liberty continued to request updated medical records from DeBoard's physicians. (A.R. 738, 769).

After receiving updated records, Liberty requested that another consulting physician review the information. On January 3, 2012, Dr. David Bomar prepared a report summarizing the results of his review of DeBoard's records. (A.R. 680). On January 6, 2012, Liberty also requested a transferrable skills analysis and vocational report from Cascade. (A.R. 679). The Report was completed on January 11, 2012. (Id). Cascade found that there were several occupations consistent with DeBoards training, education and experience. (A.R. 677). As a result of these findings, Liberty sent a letter to DeBoard on January 16, 2012, advising that DeBoard no longer meets the definition of "Any Occupation" under the Plan. (A.R. 668).

In response to Liberty's letter, DeBoard's counsel sent a letter to Liberty on March 6, 2012, advising that DeBoard will be appealing this decision. (A.R. 624). The letter to Liberty included medical records from Dr. Boodin. (A.R. 626-49). On March 26, 2012, DeBoard's counsel submitted additional medical records in support of its appeal.

5

(A.R. 611). Following Liberty's receipt of these materials, DeBoard's file was referred to the appeals unit for review. (A.R. 623). The appeal was reviewed by Jennifer Sullivan, a nurse case manager in Liberty's Managed Care Department. On April 3, 2012, Nurse Sullivan summarized the results of her review of DeBoard's medical records. (A.R. 53-5). Following this report from Nurse Sullivan, Liberty sent DeBoard's counsel a letter on April 6, 2012, indicating that they are "unable to alter [the] original determination to deny her benefits beyond January 12, 2012." (A.R. 605).

After receipt of this letter, DeBoard's counsel sent medical records to Liberty for review on May 4, 2012 and June 18, 2012. (See A.R. 573, 593). In response, Liberty sent a letter acknowledging the receipt of these letters but advised DeBoard's counsel that DeBoard has exhausted her right of appeal under ERISA. Therefore, Liberty is unable to consider this additional information. (A.R. 571). Counsel for DeBoard sent further information to Liberty on September 19, 2012, and requested a complete copy of the administrative record Liberty relied on in its decision to deny DeBoard's claim. (A.R. 458). On November 9, 2012, counsel for DeBoard sent a follow up letter to Liberty regarding the correspondence sent on September 19, 2012. (A.R. 457). Liberty responded to the letters by DeBoard's counsel on November 16, 2012, reiterating their previous position. (A.R. 455). DeBoard's counsel continued to send letters and updated medical records to Liberty. (See A.R. 99, 106). On February 20, 2013, Liberty responded again, asserting that they stand by their April 6, 2012, decision and that no new information will be considered in DeBoard's administrative record. (A.R. 97). DeBoard has now claimed benefits under § 502(a)(1)(B) of ERISA.

**B. Medical Evidence**

In January 2010, DeBoard fell at home and broke her right elbow. She was treated by Dr. Michael Yusaf, an orthopedic surgeon. In reviewing DeBoard's benefits eligibility, Liberty asked Dr. Yusaf to complete a Restrictions Form. The form was completed and returned to Liberty on February 3, 2012. (A.R. 1649). The form confirmed that DeBoard is "unable to use right arm" and should be "off work from January 24, 2010, to approximately March 15, 2010." (Id.) Dr. Yusaf indicated that DeBoard had a displaced supracondylar humerus fracture. (Id.) Dr. Yusaf continued to send Restriction Forms and sent another on February 24, 2010, which confirmed that DeBoard continued to suffer from a displaced supracondylar humerus fracture. (A.R. 1631). In April, 2010, DeBoard underwent right elbow surgery. (A.R. 466). DeBoard was discharged to subacute rehab for further therapy on April 27, 2010, and was to follow up with Dr. Greg Nowinski. (A.R. 1568).

Dr. Yusaf continued to send Liberty Restriction Forms indicating that DeBoard is still disabled. Restriction Forms were sent on April 5, 2010, and June 1, 2010. (See A.R. 1532, 1579). In Liberty's attempt to continue DeBoard's benefits, various requests were sent to Dr. Nowinski, DeBoard's physician, and Heartland Rehab centers, DeBoard's rehab center. (A.R. 1468, 1543). On August 3, 2010, Dr. Nowinski faxed a response to Liberty with answers to questions about DeBoard's specific activity restrictions/limitations. (A.R. 1421-4). Dr. Nowinski indicated that he recommended restrictions for moving objects heavier than ten pounds. (Id. at 1423).

On September 9, 2010, DeBoard underwent an "anterior cervical discectomy and fusion at C5-6 and C6-7, with a 14mm allograft of the Cloward type at each level and a

50 mm Zephir plate, and SEEP and EMG monitoring." (A.R. 1148). After her surgery, DeBoard began seeing Dr. Boodin regularly in follow up, beginning on September 28, 2010. (See A.R. 484-99). As a result of her condition, DeBoard received information regarding the Social Security disability benefits. She was advised that the State will be contacting her many physicians regarding her injury claims. (A.R. 1045).

On December 22, 2010, DeBoard then underwent another operation for "lumbar spencylostenosis and spondylolisthesis LS-S1." (A.R. 497). After her surgery, DeBoard began rehab at Heartland Oakland Manor Care, under Dr. Rajesh V. Iyer from December 30, 2010, to January 20, 2011, with an anticipated discharge date of January 31, 2011. (See A.R. 467-475).

In May of 2011, DeBoard went to visit her sister in Florida. There, she attended the Ekren Physical Therapy Service. She began treatment on May 10, 2011, and received thirteen treatments. (A.R. 850). The doctor recommended at least another month of therapy. (Id.) DeBoard began receiving physical therapy treatments at Neil King Physical Therapy in Rochester Hills from June 3, 2011, to June 30, 2011. (A.R. 880). As mentioned, in August 2011, Liberty discontinued DeBoard's receipt of benefits after a report from one of its consulting physicians, Dr. Restrepo-Gartner, given the change in definition of "Own Occupation" to "Any Occupation" under the Plan. (A.R. 822). In DeBoard's handwritten response, she indicates that she will be undergoing another surgery in September 2011 (A.R. 803) and as of August 17, 2011, she has to walk with a walker due to muscle weakness. (A.R. 807). On September 6, 2011, Liberty advised DeBoard that her benefits are reinstated. (A.R. 787).

On September 14, 2011, DeBoard underwent another surgery for "herninated nucleus pulposus T7-8 right and thoracic myelopathy." (A.R. 927). After the surgery, DeBoard began attending physical therapy sessions at Health Quest in Rochester Hills. Medical records indicate that she was a patient at Health Quest from October 10, 2011, to December 16, 2011. (A.R. 695-6, 726-8).

During DeBoard's time in physical therapy, she received notice from the Social Security Administration on November 30, 2011, indicating their favorable decision on her application for disability and disability benefits. (A.R. 656). The Social Security Administration found that DeBoard's disability began on January 24, 2010. (Id.) Liberty followed up with a letter to DeBoard on December 15, 2011, requesting a copy of her Award Letter regarding her Social Security disability benefits. (A.R. 708). As a result of DeBoards Social Security disability benefits, Liberty advised DeBoard on December 30, 2011 of an overpayment calculation because she was awarded Social Security Benefits. (A.R. 686).

As discussed above, in January 2012, Liberty issued a letter to DeBoard indicating its decision to discontinue her benefits under LTD. (A.R. 668). DeBoard's counsel responded with the intent to appeal this decision. (A.R. 628).

On March 22, 2012, DeBoard underwent a procedure at Troy Hospital for "right sacroiliac joint injection." (A.R. 612). Shortly after this procedure, on March 27, 2012, DeBoard was involved in an automobile accident. (A.R. 603). As a result of this accident, she complained of neck pain, in addition to her history of back surgeries. (Id.) Although Liberty received noticed from DeBoard's counsel of this accident (A.R. 602),

9

Liberty still issued their letter on April 6, 2012, indicating that they were upholding their previous decision of discontinuing DeBoard's benefits. (A.R. 605).

As a result of this accident and her past medical history, DeBoard continued to see various physical therapists. DeBoard visited LMT Rehabilitation Associates, specifically Dr. John T. Maltese, on April 25, 2012, due to her difficulty ambulating. (A.R. 578). Dr. Maltese suggested a therapy program to work on her functional ability. (Id. at 616). There are also extensive records from Beaumont Hospital indicating that DeBoard engaged in physical therapy from May 4, 2012, to June 29, 2012. (See A.R. 688-709). As of June 29, 2012, the records indicate that DeBoard is limited by pain when attempting to stand and engage in ambulatory tasks. (A.R. 537).

DeBoard continued to receive physical therapy treatments as a result of her injuries. She was a patient at the Crittenton Hospital Medical Centre starting August 13, 2012, and was discharged November 13, 2012, by Dr. John Maltese. (See A.R. 309-50). During this time, DeBoard began receiving spinal fusion injections. On August 6, 2012, DeBoard underwent a left sacroiliac joint injection by Dr. Sean Conroy (A.R. 182) and a right sacroiliac joint injection on October 3, 2012 (A.R. 191). On November 7, 2012, DeBoard received a bilateral sacroiliac joint injection with fluoroscopic guidance at Beaumont Centre for Pain Medicine. (A.R. 201). Although DeBoard was receiving these injections, she received a lumbar myelogram on November 30, 2012, at Beaumont Hospital. (A.R. 280).

## II. STANDARD OF REVIEW

Motions for judgment on the administrative record in an ERISA action are not akin to motions for summary judgment under Fed. R. Civ. P. 56(a). See Wilkins v.

Baptist Healthcare Sys., Inc., 150 F.3d 609, 618 (6th Cir. 1998) ("This standard of review does not neatly fit under either Rule 52 or Rule 56, but is a specially fashioned rule designed to carry out Congress's intent under ERISA."). Accordingly, a district court reviews an ERISA plan administrator's denial of benefits *de novo* unless the plan grants the administrator discretionary authority to determine eligibility for benefits. Cox v. Standard Ins. Co., 585 F.3d 295, 299 (6th Cir. 2009) (citing Gismondi v. United Techs. Corp., 408 F.3d 295, 298 (6th Cir. 2005)). If the plan gives the administrator discretionary authority, a court applies the highly deferential arbitrary and capricious standard of review. Id.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. Schwalm v. Guardian Life Ins. Co. of America, 626 F.3d 299, 308 (6th Cir. 2010) (internal quotation marks omitted) (quoting Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003)). Even when a claimant has introduced evidence that might be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits because of the plan's provisions, then the decision is neither arbitrary nor capricious. Id. (citing Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000)). Therefore, a reviewing court must uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

In her brief, DeBoard concedes that the Plan grants Liberty Life discretionary authority to determine eligibility for benefits. (Doc. No. 23 at 5). The Court agrees. Therefore, Liberty Life's decision to deny benefits will be analyzed under the highly-deferential arbitrary and capricious standard.

## III. ANALYSIS

DeBoard argues Liberty Life's decision to deny benefits was arbitrary and capricious for three reasons: (1) the record of medical evidence supports DeBoard's inability to perform "Any Occupation" under the Plan; (2) Liberty Life failed to consider the award of total disability benefits by the Social Security Administration; and (3) Liberty Life's suggested alternative occupations determined in its vocational study fail to comport with DeBoard's education and experience. Further, DeBoard demands attorney's fees for Liberty Life denying DeBoard's claim in bad faith.

### A. Liberty Life's Decision was not Arbitrary and Capricious

1. Medical Evidence

DeBoard argues that Liberty Life failed to consider DeBoard's radiculopathy and back surgeries in determining DeBoard could perform in "any occupation" under the Plan. DeBoard relies on Pappas v. Reliance Standard Life Insurance Co., where the court overturned an insurer's denial of long term benefits. 20 F. Supp. 2d 923 (E.D. Va. 1998).

The court in Pappas noted that "Reliance [the insurer] . . . engaged in an evaluation that impermissibly weighed Reliance's own financial interests . . . failed to confront the central question presented . . . and did not dispute the existence, severity,

frequency or duration of plaintiff's persistent symptoms." Id. at 929 to 930. However, DeBoard fails to identify analogous conduct by Liberty Life in the present case.

Liberty Life discontinued DeBoard's benefits under the Plan on January 17, 2012, and made a final determination on appeal to uphold its decision to discontinue DeBoard's benefits on April 6, 2012. Unlike Pappas, during the benefit review and subsequent appeal, Liberty Life considered all the information provided by DeBoard; including Dr. Boodin's August 26, 2011 note that DeBoard "has been advised to remain off work until seen again in two months" and DeBoard's back surgery on September 14, 2011. Accordingly, Liberty life extended DeBoard's receipt of LTD benefits under the Plan pending her recovery from the September 14, 2011 procedure. Liberty Life did not receive any additional opinions on DeBoard's work capacity and the record indicates an improvement in DeBoard's back condition after surgery.

Liberty Life's administrative review procedure, conducted first by consulting physician Dr. Bomar and later on appeal by Nurse Case Manager Sullivan, determined DeBoard was capable of returning to work full time in a sedentary work capacity. In combination with Cascade Management's Occupational Analysis, the administrative review procedure referenced DeBoard's restrictions derived from the initial elbow injury and is consistent with the record that DeBoard's back was healing following the September 14, 2011 procedure.

After Liberty Life upheld its decision to discontinue DeBoard's LTD benefits on April 6, 2012, DeBoard notified Liberty Life of medical records from Dr. Maltese. DeBoard first saw Dr. Maltese on April 25, 2012, almost three weeks after Liberty Life closed DeBoard's file. Dr. Maltese indicated DeBoard underwent additional procedures

on her back. However, this Court may only consider evidence that was before Liberty Life at the time of its administrative decision. E.g., Wilkins v. Baptist Health Care System, 150 F.3d 609 (6th Cir. 1998). Further, even if Liberty Life were to consider Dr. Maltese's opinions, these additional records are absent any discussion of DeBoard's work capacity. Thus, Liberty Life properly relied on the medical evidence available during its review process in reaching its decision to discontinue DeBoard's LTD benefits.

Last, DeBoard argues Liberty Life acted improperly by not conducting an independent medical examination of DeBoard. However, while the failure to conduct an in-person examination is a factor a reviewing court may take into account, "there is nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." Calvert v. Firstar Finance, Inc., 409 F.3d 286, 296 (6th Cir. 2005). Liberty Life's review process, conducted by Dr. Bomar and Nurse Sullivan, comports with similar Sixth Circuit cases. See E.g., Judge v. Metropolitan Life Ins. Co., 710 F.3d 651 (6th Cir. 2013) (upholding a plan administrator's decision denying disability benefits based upon a record review completed by a nurse consultant); Whittaker v. Hartford Life Insurance Co., 404 F.3d 947 (6th Cir. 2005) (upholding an insurer's claim denial which was based upon file reviews completed by consulting physicians who did not personally examine the claimant).

### 2. Social Security Award

A finding of disability by the Social Security Administration does not "automatically entitle[] [a claimant] to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security Administration's." DeLisle v. Sun

14

Life Assur. Co of Canada, 558 F.3d 440, 445-46 (6th Cir. 2009) (citing Whitaker v. Hartford, 404 F.3d 947, 949 (6th Cir. 2005)). However, where the plan administrator

> (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious.

Bennett v. Kemper Nat. Servs., Inc., 514 F.3d 547, 554 (6th Cir. 2008).

DeBoard's argument that the Social Security Benefits award should have been a factor in her favor is unpersuasive. The decision will be a factor in favor of the claimant where the plan administrator "encourages" the claimant to apply for Social Security benefits and later discounts the award without explanation in its denial of benefits under an ERISA plan. See Bennett, 514 F.3d at 554.

There is no evidence or allegation that DeBoard was "encouraged" to apply for Social Security Benefits. DeBoard received her favorable Social Security determination in January, 2010. Soon thereafter, Liberty Life received notification of the award. (A.R. 708). The record indicates, contrary to DeBoard's argument, that Liberty Life considered the award in its denial of DeBoard's appeal. (A.R. 650). In Bennet, the Sixth Circuit ruled that a plan administrator should take into account a favorable social security award in making an administrative decision. Yet, the court in Bennett fails to require an administrator to specifically refute the reasoning of a social security award. Id. at 553 – 54. The notification letter DeBoard sent to Liberty Life failed to specify contributing factors leading to her favorable decision. (A.R. 708-16). Accordingly, Liberty Life took account of the social security award in making its determination that DeBoard was no longer disabled under the Plan.

Moreover, the SSA's finding of disability predates Liberty Life's final determination by nearly two years, in which DeBoard's diagnosis shifted from the initial elbow injury to back ailments and procedures. See Cox v. Standard Ins. Co., 585 F.3d 295, 303 (6th Cir. 2009) (rejecting plan administrator's failure to consider Social Security benefits award as a factor to be weighed in favor of finding the decision arbitrary and capricious where the "determination was made . . . two years before [administrator's] review of [plaintiff's] claim"). Consequently, this factor does not weigh in DeBoard's favor.

### 3. Occupational Analysis

DeBoard argues the sedentary employment opportunities suggested by Liberty Life's Occupational Analysis are unreasonable based on her education and experience. However, DeBoard failed to raise this argument during her administrative appeal. The Sixth Circuit requires that in an ERISA benefits action, a reviewing court should not consider arguments raised by plaintiff in litigation which were not made during the administrative review process. See Eg., Peruzzi v. Summa Medical Plan, 137 F.3d 431, 435 (6th Cir. 1998) (stating a claimant may not properly raise a new argument where it is unclear that he presented it to the plan administrator); Sandoval v. Aetna Life & Casualty Insurance Co., 967 F.2d 377, 380 (10th Cir. 1992) (under abuse of discretion review, the court refused to consider arguments claimant failed to make to the plan administrator).

Even if the Court were to discount the alternative positions identified by Liberty Life's Occupational Analysis, the Plan provides a built-in protection that addresses DeBoard's argument that benefits could be denied based upon identification of

16

alternative occupations which are far below the educational or prior work experience of a claimant. "Any Occupation" under the Plan contains an earnings threshold where "gainful employment" is an employment opportunity compensated "equal or greater than the gross benefit." (A.R. 7). DeBoard's monthly gross benefit under the policy was $3,265.99 and almost all of the alternative occupations identified by the vocational report provide earnings higher than DeBoard's gross benefit. Thus, based on Liberty's Occupational Analysis and the protections built into the Plan, the alternative positions recommended by Liberty Life are consistent with DeBoard's ability and physical restrictions.

**IV. CONCLUSION**

Accordingly, the Court **GRANTS** Defendant's motion, **DENIES** Plaintiff's motion, and **AFFIRMS** the decision of the plan administrator.

**IT IS SO ORDERED.**

Date: August 18, 2014                               s/Marianne O. Battani
                                                    MARIANNE O. BATTANI
                                                    United States District Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 18, 2014.

                                                    s/ Kay Doaks
                                                    Case Manager